Calling case number 18-5136, the United States of America v. Edgar Villa-Castaneda. Oral argument not to exceed 15 minutes per side. Mr. Allen for the appellant. Good morning. May it please the court. Ben Allen with Gas Manningly on behalf of the appellant Edgar Villa-Castaneda. I would like to reserve three minutes of my time for rebuttal. Very well. Thank you, your honors. In this case, the district court committed reversible error by refusing to suppress a custodial statement. Mr. Villa gave to the FBI that was not recorded in violation of DOJ policy at the time. We did not Okay, the fact that it violates the policy, is that grounds to suppress it? No, in fact, your honor What does it matter then? In your honor, in our brief, we do note that, and we don't argue that it creates a substantive ground for relief, but it was a factor that we asserted to the court for its consideration in the totality of the circumstances. It's a factor of whether he understood English? Your honor, I believe it's a factor as to the totality of circumstances, as to the whole context of the interview. You don't claim it's coercive, do you? Your honor, I I would think recording it probably is the most valuable as evidence of whether it was coercive or not, the way questions were asked, the manner that they were asked, but whether they Okay, I mean Judge Griffin, I understand your question, and I think the crux of this case and what it's centered on, did Mr. Villa understand, given his language difficulties, his understanding of the English language, in the context of this interview, did he truly understand the warnings that were given to him? Obviously, the FBI agents asserted that he did, Mr. Villa testified that he did not Okay, so the argument is if it had been videoed, that maybe the manner that he reacted would show his lack of understanding. It would go to that. Yes, and I believe, while we did not allege, obviously, that there was direct coercion of Mr. Villa to sign the statement, he did testify during the suppression hearing that he did not understand the written or oral warnings given to him, and that he signed it when the agents insisted that he did so. And that fact, and what we noted for the court to consider, the district court to consider, was a factor we believe that was relevant under the totality of circumstances. All right, I understand. Thank you. Thank you, Judge. Well, if the issue is understanding, what do we do with the record evidence that showed that he spoke English with cellmates, with staff, former job in a restaurant where he read English, recordings showed that he spoke English and responded in English, booking officer testified that the defendant understood what he was saying. Where is the record evidence other than his own testimony that he didn't understand? Your Honor, and I'll try to direct each of those points with respect to the FBI introduced, or the government introduced a surreptitiously recorded conversation in the van on the way to the district courthouse. The quality of that recording, first of all, Mr. Vian, we never asserted that he could not speak rudimentary English. We never asserted that. The audio tape from the van to the courthouse was of such poor quality that no one could understand, the court, government, could understand exactly what was being said. Correct, but the judge said it was clear that it was English that was being spoken. We can surmise that the two were speaking English, yes. But as we noted in our brief, I believe there's a difference between, and Mr. Vian testified that he learned rudimentary English working in the United States. I believe there's a difference between being able to have a rudimentary understanding of English in the context of this case, did he in fact understand what was being said to him. I'm trying to think of your next point, Your Honor, but with respect to Judge Boyd, I'm sorry, Officer Boyd, I believe from the Woodford County Detention Center, her testimony. Again, I go back to he may have been able to converse with her about basic things, which again is consistent with what he testified in the suppression hearing, that he worked in a restaurant business, he was able to understand rudimentary English. Did he in fact understand what was being said to him in the context of this case? Did your client have any prior experience with the justice system? He did, Your Honor. Oh, he's been through this before? He's been through the justice system before. Wouldn't that give him a little understanding of what the English words mean, that he's been this route before? Well, again, and I think as the district court noted, that the record was that in each of those instances he utilized an interpreter. And while that's certainly not outcome determinative, in other words. He has an interpreter in court, but he hasn't had an interpreter. I mean, this is outside of court, right? Correct. Did he always have an interpreter outside of the court when he had these other charges? I don't believe the record reflects that, Your Honor. I'd be surprised if he did. Correct. But there was no record evidence to my knowledge as to the number of instances where he may have been given the Miranda warnings outside of court and was there an interpreter used in those instances or not. The government put forth no evidence as to that. So that would be the distinction I would draw there, is to what level of comprehension did he have to understand the warnings in this context? Now, your client was in the country something like 10 years prior to this? I believe he was in and out of the country, Your Honor. He testified prior to this. So he was arrested on an underlying drug charge during which the alleged threat was made. He had been in and out of the country. He's claiming that after 10 years his language is still deficient? Yes, and he had a speaking knowledge of English, Your Honor, but he testified he could neither read nor write in English. And the government put forth a little evidence of that. I believe there's some evidence of a medical questionnaire at the Woodford County Detention Center. But outside of that, his testimony was that he was able to work in the restaurant, had a basic kind of conversational understanding of English, but in this context did not understand the Miranda warnings read to him prior to his interrogation. Setting aside what he may or may not have understood or been able to speak, how do you distinguish the El Cholon case? Thank you, Your Honor. You're welcome. Three bases I would distinguish the El Cholon case. First, in El Cholon, the agents in that case testified that they knew the defendant had resided in the United States for 12 years. In this case, I don't believe the agents testified they knew how long Mr. Villa had resided in the United States at all. I believe the testimony came out through his criminal record as to when he may or may not, when he may have been in the United States. But in El Cholon, the agents definitely knew he had been in the United States for 12 years. More importantly, El Cholon, he was a naturalized U.S. citizen. As part of that naturalization process, the agents testified they had evidence and knew that he had passed a naturalization exam, an English proficiency exam, and had sworn under the penalty of perjury that he could speak English. In addition, they introduced in that case recorded conversations between Mr. El Cholon and the FBI agent where they were clearly conversing in English, I would argue, and where he admitted to the FBI agent he could speak in English. On those bases, I would argue that with the knowledge base of the FBI agents in that case, they clearly knew that Mr. El Cholon spoke English. You had a statement under oath during a naturalization process that he spoke English, none of which we have here. In the El Cholon case, I understand, as the district court noted, that the district court must look at it from the perspective of the police officers. I would argue here, for the grounds I just explained to the court, that this case was distinguished from El Cholon in that matter. Your Honors, I also cited United States v. Garibay, which is a Ninth Circuit case. I understand that's not binding on this court, but I believe it was instructive. It was instructive to the district court because at least three of the six factors announced by the Ninth Circuit in that case favored suppression here. First, whether the agents gave Mr. Villa his Miranda warnings in his native tongue, Spanish. There's no dispute that they did. Secondly, did the agents individually explain each of his rights to him in a manner you can understand? Agent Whitehead testified in the suppression hearing that they read through his Miranda warnings only one time. That they utilized the English version of the Miranda form, even though they had the Spanish form easily available. I believe the record evidence would reflect that they really only gave him a cursory review of his rights prior to what was a custodial interrogation. Cursory? They only gave the Miranda rights in a cursory fashion? They didn't read them verbatim? I would say that they briefly read to them. I'll withdraw the word cursory. I mean, if they didn't, you might have a good argument. Your Honor, the record indicates that they did not individually explain each right. That's different than not reading them. I don't mean to suggest that they didn't read the rights to him, Your Honor. Thank you. And the third factor is the agents testified that they did not utilize a translator during the interrogation, even though one was readily available. All of which would be consistent with their belief that he understood what they were saying. I understand, Judge, your point on that, but I believe the agents also testified that they knew he was not from the United States and that he spoke Spanish. The agents testified that they did not speak Spanish. And so I would submit that they knew in that instance that they should have used a translator. Well, is there any indication that the officers realized that he was having communication difficulties, that there was something that led the officers or alerted them that he might not understand? Your Honor, the agents testified that they believed that he could speak English. That he did understand. That was their testimony in the suppression hearing. And did he say or did he testify that it was obvious to him that they realized he didn't understand? He said he didn't know, but I'm now looking at the officer's perspective. Did he say that something I said I could tell I alerted the officers that they knew I didn't understand? That Mr. Villa did? Yes. I believe in the record he did testify that he said that he could not understand the warnings. I'm looking at their perspective. That he said, I could tell they didn't understand, but they proceeded anyway. Anything like that. I'm not aware of any testimony from the agents. Or him. Or your client. No. Mr. Villa testified that he indicated to the officers, the agents, that he couldn't understand what they were saying. Again, this is Mr. Villa's testimony. And according to Mr. Villa, they insisted that he go ahead and sign the form. That's what he testified, I believe, during the suppression hearing. All right. Thank you. Your Honor, I'm about out of time, but I'll sum up and in conclusion ask. Are you going to address the issue about consecutive sentencing? Sentences? I was going to briefly address that, Your Honor. I see my time is up. Well, I'd like you to address it, so if it's all right with the presiding judge. Yeah, go ahead. Take a minute or two. Take a couple of minutes. I'd take a minute on that, Your Honor. Our point on the second issue, judges, was it's our assertion that the district court abused its discretion in imposing what effectively amounted to a life sentence. And that's because, again, we did not reject the actual guidelines calculations, but merely to its discretion in running the sentences on both counts consecutive to each other and also consecutive to his 18-year. And you agree the sentences are within the guidelines and, therefore, presumptively reasonable. And you also recognize that the judge has the discretion to impose consecutive sentence. So you just say that he abused it? How did he abuse it? Well, Your Honor, he was required to impose what would be an appropriate incremental penalty, considering his current, he had 18 years left on his underlying drug case. And we had objected to the district court that it was an abuse of discretion to run everything consecutively to that. But he has the discretion to do that. He recognized his discretion, and you just dispute his exercise of that discretion. That is correct, Your Honor. On the grounds that he was too young, you seem to be arguing in your brief an age factor that is the primary reason for the abuse of discretion. Correct, Judge. That was our point in the briefs was that running the entire sentence consecutive to his 18-year drug sentence was, in effect, it was a live sentence that Mr. Vee objected to as not being reasonable. Well, we may not agree, or you may not agree with the decision. When I looked at the record, the district judge certainly went through the 3553A factors and highlighted those that he felt required a severe sentence. Correct. And the point I highlighted about an appropriate incremental penalty was the basis, really, of our objection on that ground, Your Honor. If there are no further questions, I'll yield the podium. Thank you. Thank you very much. You'll have your rebuttal time. May it please the Court, Terry Cushing for the United States. Your Honors, this record is a very thorough record. It's one of the best we've had in a long time, I think, that shows on both of these issues that the agents did their job, they respected this man's rights, they made sure they were respecting his rights, and there's no reason to believe that they simply just ran roughshod over a non-English speaker. And on the sentencing issue, the record shows that the district judge went through every factor that he was required to. He cited all the relevant statutes, he cited the relevant guidelines. This Court doesn't even require that the judge actually cite the relevant guidelines or statutes, just as long as the record shows that the judge considered them. But this record here shows that the judge considered them, did a thorough analysis of each factor, and imposed a sentence that was within its discretion to impose. On the suppression issue, these agents here, unlike the agents in this Garabay case from the Ninth Circuit, but closer to the Alchon case here, did their homework before they questioned Mr. Villa-Castaneda. They talked to inmates who he had interactions with. All the inmates they talked to said, converses in English every day. Inmates who didn't speak Spanish at all, they wouldn't have understood the Spanish if Mr. Villa-Castaneda wanted to speak Spanish. He understood English, he's fluent in English. The prison authorities told the agents, yes, we conversed with him in English. His intake form indicated he didn't need an interpreter. Even when they sat down to talk to him, though, with all this background, they believed he could speak English, but they made sure with him. They asked him, is he comfortable in English, and he told them he was. They asked him if he wanted an interpreter. He said no. He declined that. And these questions here weren't just yes and no questions and answers, and the district court found the agents credible on this, and this court always gives great deference to a district court's credibility findings, that they asked open-ended questions. And Mr. Villa-Castaneda gave detailed responses in English to their questions. No evidence at all, except for maybe Mr. Villa-Castaneda's self-serving testimony, that he had any trouble understanding anything they said. This concept of— You wouldn't even need to have this argument if this had been recorded, right? That is true, Judge. And the recording aspect would only go to whether the district judge's credibility finding was clearly erroneous. It probably would have even obviated the need for a motion on the defendant's part if there had been a recording. And you're talking to an appellate lawyer, Judge, who wishes they would just record this. The more in the record, the better. Why don't they? If this is the Department of Justice policy, why don't they follow the policy? Well, they do now. Was it not the policy then? It was a brand-new policy, and it was still being—the details and the procedures were being worked out. So it wasn't in effect at this time? That's a point where, despite the fact that this record is very clear on most things, that was a point in the record that I didn't find particularly clear. Well, I mean, can't we just take judicial notice of when Department of Justice policies are in effect or not? I mean, I think that's easy to find out. Well, but it's not as simple as that, because a policy is announced by the department, and then each agency then rolls it out. Exactly. They have to form the procedures that that particular agency— I guess I'm learning something new. But, Judge, I mean, we can just—we'll even assume that it was a policy and they didn't record it in violation of the policy. It does not, in this circumstance, with all the other record evidence we have, call for a reversal of this judgment. I guess what I'm getting—there's not a policy of them ignoring— a local policy of ignoring the Department of Justice's policies. No, no, not at all. For whatever reason or something. But the department itself recognizes that each agency has to implement their own procedures in following the policy. But, again, we could say that they didn't follow the policy and that would have been a factor that the court could have considered, and the court did consider. It was brought up. He didn't mention it in his memorandum opinion, but he found these agents credible because of the other detail in their testimony and all the corroboration that they had with the tape of Mr. Villa-Castaneda talking to the inmate marshal, I think it was, where they spoke in English. The deputy chief of the jail is saying that he spoke English to her, and she testified at the hearing. So we have all this other evidence. So we could say that, well, that would be a count on Mr. Villa-Castaneda's side, but it would only go to credibility again. But we've got all these other checks on the side of the agents were correct in talking to him in English. Can you comment on opposing counsels distinguishing Al-Shalaan, since you're citing it as well? Yes. Those distinctions don't really matter here. Obviously they're not on all fours. The facts aren't strictly the same. But the similarities here are what are more important. The agents believed he could speak English, and it wasn't just we believed it and that was their testimony and do you believe them or not. They did their homework like they did in Al-Shalaan. In Al-Shalaan, the agents there also researched his familiarity with English before they ever talked to him, and that's what happened here. The agents did their homework. They researched it. They went and talked to people and looked at his record. They knew he'd been in trouble before. So all these factors, those are present to the extent that Al-Shalaan were slightly different factors. Not exactly. He was in the country for 12 years. Mr. Villa-Castaneda has been in this country for 10 years. Maybe off and on, but it looks like more on than off. But at any rate, he conversed in English in all of his dealings with the people he dealt with. And on this record, the court should affirm the district court on his ruling there. Do you agree with the length of the sentence the judge handed down in this case? Well, if you're asking me for my personal opinion, Judge, yes. But I've never seen a sentence I thought was too harsh. But that aside. I'm sorry. I didn't hear what you said. I'm sorry, Judge. It was a poor joke. I said I haven't seen a sentence that I thought was too harsh. You haven't seen it? My personal beliefs. No, you're kidding, aren't you? Yes, Judge. I'm sorry. You have seen sentences that, in your view, would be too harsh, right? Well, if we talk about complete history in every jurisdiction, sure. But I've never seen one in the Western District of Kentucky. I'm sorry. Oh, you haven't? The judges in the Western District of Kentucky have never imposed an unreasonably harsh sentence, in your view? Well, to the extent that my view is relevant, Judge, yes. That is my view, and I don't have any problem expressing it. I'm surprised, because I generally agree with tough sentences. But I've seen overly harsh sentences almost everywhere, on occasion. Well, Judge, again, to the extent that my belief is relevant, which it is not, what we really need to focus on here is that the district judge had the discretion to impose this sentence. The factors that the judge considered, he went through them thoroughly. My colleague on the other side here cannot point to a single factor that shows that the district court abused its discretion, because it considered all the factors, it analyzed all the factors. Mr. Villacastaneda disagrees with the judge's conclusion on those factors, but that's not a basis to reverse the district court. The district court was properly within its discretion, and this court should find that the district court imposed a reasonable sentence and affirm. Thank you, Your Honors. Thank you very much. Any rebuttal? Thank you, Your Honors. Briefly, when it comes to the effective date of this policy, we attached a copy of that policy in the appendix. It's the Defendant's Exhibit 1. It went into effect on July 11, 2014. I believe Mr. Villa's interview was in November of 2015. What about this argument that it's not effective until it's rolled out in each area or something? Your Honor, I've read the policy. I don't believe that it says anything in there about each individual office can effectuate it on its own. I'm not sure how that's a policy that would, you know, the FBI office in Louisville is different than the FBI office somewhere else can effectuate them in different ways. I don't believe there's any record evidence of that to the district court in the suppression hearing. The record evidence was that this policy was in place, and the FBI did not follow it in this instance. And I agree with the court that it may have answered this question, but we don't know because there was no recording. We don't know because the FBI produced no notes from their interview. What they had was the summation of what Mr. Villa apparently told them, which was a critical and key factor in convicting him at the trial. Why did the FBI not produce their notes? Were they asked for? We did ask for them at trial, and they were not available to produce, Your Honor. Why were they not available? They said they were not able to be produced. What does that mean? They didn't exist anymore? I mean, you accepted that answer? I don't think you should. Were you trial counsel? Yes. You accepted that answer? Well, I don't believe the answer was whether they exist or not. I believe they did not exist. They did not exist. That's different than. I want to submit they did not exist. Okay. Sorry. That's not what you said. Sorry. Correct the confusion, Your Honor. They did not exist and were not able to be produced for that reason. With respect to the sentence, Your Honor, obviously I've gone through it. I acknowledge the court's discretion, but it was Mr. When you're talking about a consecutive sentence, I think we've acknowledged in our brief it's kind of a mixed hybrid of procedural and substantive analysis in which it's our position that the court abuses discretion in that instance. But to sum up, Your Honor, Mr. Veal, with respect to your request that the court reverse the lower court's decision denying its motion to suppress, they get a sentence and remand this matter back to the district court for further proceedings. Thank you. All right. Thank you. And the case is submitted. Mr. Allen, the court certainly would like to thank you and express its appreciation for you accepting this case under the Criminal Justice Act. We know that you do that as a service to our system of justice. Thank you very much.